GARY Y. LEUNG (Cal. Bar. No. 302928)
Email:  leungg@sec.gov
DONALD W. SEARLES (Cal. Bar. No. 135705)
Email:  searlesd@sec.gov
SARA D. KALIN (Cal. Bar No. 212156)
Email:  kalins@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Ste. 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| RICHARD CONDON and JONATHAN ROSS, | |
| Defendants, and | |
| ALI SAGHEB, | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Venue is proper in this district under Section 27(a) of the Exchange Act,

15 U.S.C. § 78aa(a), because the defendants and relief defendant reside in this judicial district and because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3.      This enforcement action concerns insider trading by Defendants Richard Condon and Jonathan Ross in the securities of P.F. Chang's China Bistro, Inc. ("PF Chang's"). Condon is a "life coach" who worked as an executive coaching consultant for Panda Restaurant Group ("Panda"). While consulting for Panda between the fall of 2011 and the spring of 2012, Condon learned that Panda was working to acquire PF Chang's, an effort Panda internally referred to as "Project Potsticker." Condon repeatedly shared material nonpublic information about the potential acquisition of PF Chang's with his close friends, Ross and Howard Schultz, in violation of the strict confidentiality obligations and duty of trust and confidence that Condon owed to his client, Panda.

4.      Although a deal to acquire PF Chang's initially fell through in fall 2011, Project Potsticker was resuscitated in the spring of 2012, when a PF Chang's financial advisor approached Panda and invited it to participate in a bidding process for the company. The financial advisor told Panda that PF Chang's had already received an acquisition offer from another company which "started with a five." At the time, PF Chang's stock was trading at around $40 per share. As Panda prepared and submitted a competing bid, Condon tipped Ross and Schultz about the potential acquisition of PF Chang's. Both Ross and Schultz then bought risky, short-term, and out-of-the-money PF Chang's call options with a $45 per share strike price. Once PF Chang's announced on May 1, 2012 that a third party would be making a tender offer at $51.50 per share (Panda's bid was ultimately unsuccessful), its stock price jumped 25%. Immediately following that announcement, Ross and Schultz sold their PF Chang's call options and realized about $58,281 and $231,447 in illicit trading

profits, respectively.  Meanwhile, Ross also shared the material, nonpublic information concerning PF Chang's potential acquisition with his friend, Ali Sagheb, and caused Sagheb to trade in parallel with him.  Sagheb consequently realized trading profits of $17,994.

5.     Following their trading in PF Chang's securities, Condon and Ross took steps to conceal their illegal conduct.   Months later, in response to a FINRA inquiry into potential insider trading, Condon lied to Panda when asked if he knew a trader identified as "Schultz, H."  Condon did so only after placing urgent phone calls to both Ross and Schultz the night before.  For their part, Ross and Sagheb agreed that they should not talk about their trading in PF Chang's with anyone else.

6.     By engaging in this conduct, Defendants Condon and Ross violated Sections 10(b) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), and Rules 10b-5 and 14e-3 thereunder, 17 C.F.R. §§ 240.10b-5, 240.14e-3.  Further, Relief Defendant Sagheb has no legitimate claim to his trading profits and was unjustly enriched.

7.     With this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws, disgorgement of ill-gotten gains together with prejudgment interest, and civil penalties from Defendants Condon and Ross; and disgorgement of trading profits together with prejudgment interest from Relief Defendant Sagheb.

## PARTIES AND RELATED ENTITIES

8.     Richard G. Condon, age 66, resides in Los Angeles, California.  Condon worked for 21 years at Landmark Worldwide, a personal training and development company, and is an experienced "life coach."  From 2011 through 2014, Condon acted as an independent consultant for Panda, providing executive coaching services to Panda's top management executives.

9.     Jonathan Ross, age 53, resides in Venice, California.  Ross and Condon are close friends.  Ross believes Condon to be a benevolent presence in his life and in

his correspondence with Condon, Ross has expressed love and affection for him.  In 2011, Condon and Ross discussed the possibility of opening a bicycle exchange business together.  They also worked together to find potential investors in another side business owned by Ross.  Between fall 2011 and spring 2012, Ross provided copy-editing services for Condon's executive coaching business, for no apparent fee.  He also assisted Condon's business by looking for new consulting work that Condon could perform.

10.    Ali Sagheb, age 43, resides in Culver City, California.  Sagheb is self-employed and owns book-keeping, technical support, and landscaping businesses.  Sagheb and Ross are close friends and share an interest in the stock market.

11.    Howard P. Schultz was a producer of unscripted television.  Condon and Schultz were close friends for over 30 years.  They first met through their involvement in a predecessor of Landmark Worldwide.  In the course of their long friendship, Schultz invested in two of Condon's businesses, a restaurant venture and a company called Botanicx.  Schultz's investment in Condon's company, Botanicx – in an amount exceeding $100,000 – occurred after the trading in PF Chang's securities alleged herein.  Schultz died on December 29, 2014.

12.    PF Chang's is a Delaware corporation headquartered in Scottsdale, Arizona.  PF Chang's owns and operates upscale bistro restaurants that serve Chinese-inspired cuisine.  Its common stock was formerly registered with the SEC pursuant to Section 12(b) of the Exchange Act, and was formerly traded on the New York Stock Exchange.  The company's options primarily traded on the Chicago Board Options Exchange, International Securities Exchange, and NASDAQ OMX PHLX.  In July 2012, subsequent to Defendants' illegal conduct alleged herein, PF Chang's was taken private and voluntarily deregistered its shares.

13.    Panda is a private California corporation headquartered in Rosemead, California.  Panda offers gourmet Chinese food in three different types of restaurants, the most popular being Panda Express, a "fast casual" restaurant with over 1,500

locations nationwide.

## COMMONLY-USED TRADING TERMS

14.    A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (called the "strike" price), prior to the option's expiration date.

15.    A "call option" gives its purchaser-holder the right, but not the obligation, to purchase a security at a specified strike price within a specific time period.  In general, the buyer of a call option anticipates that the price of the underlying security will rise above the specific strike price before the option expires, thereby resulting in a profit when the call option is exercised.

16.     A "put option" gives its purchaser-holder the right, but not the obligation, to sell a security at a specified strike price within a specific period of time. Put options are most commonly used in the stock market to protect against the decline of the price of stock below a specified price.

17.    A call option with a strike price that is higher than the market price for the security, or a put option with a strike price that is lower than the market price for the security, is called, "out of the money."  Out-of-the-money call or put options are significantly cheaper than "in the money" or "at the money options," but generally carry far greater investment risk because the option trader's views as to what may happen in the future as to a security's stock price may prove to be wrong.

## FACTS

**A.    Condon's Consulting Agreement With Panda**

18.    In July 2011, Condon and Panda entered into a consulting agreement.

19.    That consulting agreement required Condon to provide executive coaching to Panda's co-chief executive officers, senior management team, zone vice-presidents of operations, and other employees with respect to certain projects and educational courses.

20.    Under the agreement, Panda paid Condon $10,000 a month for his

1   executive coaching services.

2        21.    The consulting agreement also contained a section entitled "Confidential

3   Information," which prohibited Condon from "disclos[ing] Panda's Confidential

4   Information to any third party, without the advanced written consent of Panda."  The

5   consulting agreement defined "Confidential Information" as "any and all proprietary

6   information of any nature or kind," including "business information."

7        22.    No later than August 8, 2011, Condon began attending Panda's weekly

8   senior team meetings where the company's top executives discussed confidential

9   matters significant to Panda's business.

10        23.    Separately, Condon conducted individual coaching sessions with both of

11   Panda's co-CEOs, each of whom placed a great deal of trust in Condon.

12        **B.    Project Potsticker:  August 2011 Discussions**

13        24.    In July 2011, Panda's executives began discussing a possible acquisition

14   of PF Chang's, which Panda management code-named "Project Potsticker."

15        25.    On August 8, 2011, Condon attended a Panda senior team meeting

16   during which Project Potsticker was discussed in detail.

17        26.    At that August 8, 2011 senior team meeting, attendees – including

18   Condon – were cautioned to keep discussions concerning the potential acquisition of

19   PF Chang's on a "need-to-know" basis, and to use the "Project Potsticker" code name

20   at all times in both oral and written communications.

21        27.    During that meeting, Panda's in-house attorney also educated the team

22   about securities laws and regulations prohibiting insider trading, and instructed them

23   not to talk to anyone about Panda's interest in acquiring PF Chang's.

24        28.    On August 22, 2011, Condon attended another Panda senior team

25   meeting during which Project Potsticker was again discussed in detail.

26        29.     At that August 22, 2011 senior team meeting, Panda executives made a

27   PowerPoint presentation on Project Potsticker.  In the course of that presentation,

28   attendees – Condon included – learned that:

i.     Panda had begun purchasing PF Chang's stock and owned 2% of the company as of August 19, 2011;

ii.    Panda had discussed the potential transaction with Bank of America Merrill Lynch ("BOAML") and a private individual, both of whom would provide the necessary financing for the transaction; and

iii.   an additional strategy meeting with BOAML and Panda's private funding source was scheduled for early September 2011.

30.    During the August 22, 2011 senior team meeting, attendees were cautioned, yet again, to keep Project Potsticker confidential and advised of the federal securities laws' prohibition on insider trading.

**C.   Defendants' Fall 2011 Trading In Anticipation of An Acquisition Announcement**

31.    In early September 2011, Condon and Panda executives worked together in preparation for a Panda operations leadership conference set to take place from September 7-9, 2011.

32.    Condon personally attended the operations leadership conference, was heavily involved in meetings held during the September 7-9 conference, and was in frequent contact during that time with other Panda senior team members, including its co-CEOs and CFO.

33.    On information and belief and as detailed below, the sequence of contacts and trading by Ross, Schultz, and Sagheb in fall 2011 demonstrates that Condon tipped Ross and Schultz material nonpublic information about the potential acquisition of PF Chang's, that Ross and Schultz both traded on the basis of that information, and that Ross caused Sagheb to trade in parallel with him.

34.    In tipping Ross and Schultz material non-public information about the potential acquisition of PF Chang's, Condon breached his fiduciary duties of trust and confidence he owed to Panda, and disclosed that information for a personal benefit.

35.    In trading on the basis of that material nonpublic information, Ross and

Schultz knew or should have known that Condon had disclosed that information to them for a personal benefit in breach of the fiduciary duties of trust and confidence he owed to Panda.

### 1.   Ross and Sagheb's fall 2011 trading

36.     During the week of Panda's operations leadership conference, Condon had multiple communications with Ross in the form of text messages and phone calls.

37.     Ross, in turn, had multiple communications with his friend, Sagheb, in the form of text messages and phone calls.

38.     On Monday, September 5, 2011, Condon spoke with Ross by phone at 6:45 p.m. PST for nine minutes.

39.     The very next day, on Tuesday, September 6, 2011 at 7:52 a.m. PST, Ross bought stock in PF Chang's.

40.     On Thursday, September 8, 2011, Ross called Sagheb at 12:01 p.m. PST and spoke with him for seven minutes.

41.     After hanging up with Sagheb, Ross immediately phoned Condon at 12:08 p.m. PST, and talked with him for a minute.

42.     Once done speaking with Condon, Ross called Sagheb three times over the next 40 minutes, beginning at 12:12 p.m. PST.  Ross and Sagheb talked for a total of 18 minutes.

43.     In the middle of their conversation, Ross and Sagheb simultaneously bought the same series of PF Chang's call options at 12:16 p.m. PST.

44.     Later that Thursday afternoon, at 1:34 p.m. PST, Condon sent Ross a text message.

45.     The following morning, at 9:25 a.m. PST on Friday, September 9, 2011, Ross bought even more PF Chang's stock.

46.     Ross then spoke with Condon that evening, at 5:28 p.m. PST on the final day of Panda's operations leadership conference, for another 13 minutes.

47.     Right after his call with Condon, Ross called Sagheb at 5:41 p.m. PST

and the two men spoke for 37 minutes.

48.     On Sunday, September 11, 2011, Condon and Ross continued their close communications, exchanging at least 9 text messages, meeting in person around noon, and finally speaking by phone at 5:46 p.m. PST for two minutes.

49.     Following his evening phone call with Condon, Ross immediately called Sagheb at 5:48 p.m. PST, and talked with him for two minutes.

50.     Early the next morning, on Monday, September 12, 2011, Ross called Sagheb at 7:51 a.m. PST.  While on the phone, Ross and Sagheb both made another purchase of PF Chang's call options, investing in the same series of call options as one another.

51.     Later in the afternoon, Condon attended another senior team meeting during which Project Potsticker was discussed by Panda's executive management.

52.     The evening of Monday, September 12, 2011, at 7:20 p.m. PST, Condon and Ross spoke yet again by phone for 24 minutes.

53.     After hanging up with Condon, Ross immediately called Sagheb at 7:45 p.m. PST, and talked with him for 26 minutes.

### 2.     Schultz's fall 2011 trading

54.     Condon separately called Schultz, and the two decided to meet for lunch on Monday, September 12, 2011.

55.     At 1:59 p.m. PST, after having lunch with Condon, Schultz called and left a message with his stock broker.  Schultz's broker called him back at 2:15 p.m. PST, after the market close for the day.

56.     The following morning at 6:33 a.m. PST on Tuesday, September 13, 2011, Schultz bought PF Chang's stock in one of his largest securities trades of the year.

### D.     October 2011:  Project Potsticker Stalls

57.     On or around September 23, 2011, Panda scheduled an in-person meeting with PF Chang's, which occurred on October 5, 2011, in Scottsdale,

Arizona.

58.     During the Scottsdale meeting, Panda executives communicated their interest in acquiring PF Chang's.

59.     On October 19, 2011, however, PF Chang's notified Panda that it had decided not to be acquired and would instead move forward with its own strategic plan.

60.     Beginning two days later, on October 21 and October 22, Condon contacted Ross through multiple text messages and phone calls.

61.     On Monday, October 24, 2011 and Wednesday, October 26, 2011, Ross and Sagheb sold out of their unexpired positions in PF Chang's stock.

62.     The next morning, Thursday, October 27, 2011, PF Chang's publicly announced, prior to the opening of the market, that its earnings were lower than expected, and stated during its earnings call that it was not interested in being acquired.

63.     Immediately following those announcements, PF Chang's stock price fell by 5% from the prior day's closing price, a drop that Ross and Sagheb avoided when they sold their PF Chang's securities days earlier.

64.     Schultz sold his PF Chang's stock in December 2011 and January 2012.

65.     In their fall 2011 trading, Schultz and Ross each made small investment gains, while Sagheb sustained a small loss.

66.     After their frenzy of trading in fall 2011, Ross, Sagheb and Schultz did not execute a single trade in the securities of PF Chang's until the following spring.

**E.     Spring 2012:  Renewed Discussions of a Potential PF Chang's Acquisition**

67.     On March 27, 2012, PF Chang's financial advisory firm approached Panda to gauge Panda's interest in participating in a bidding process for PF Chang's.

68.     The financial advisor informed Panda that PF Chang's had already received a formal written offer from another bidder, and that the offer was for a per

share acquisition price with two digits, which "started with a five."

69.    Around that time, PF Chang's stock was trading at approximately $40 per share.

70.    The financial advisor also told Panda that PF Chang's would be reaching out to several other companies who had shown a prior interest in acquiring PF Chang's, to invite them to make a competing offer.

71.    At an April 2, 2012 senior team meeting, Panda's CFO updated the group on the new offer that PF Chang's had received which "started with a five," and on the fact that PF Chang's would likely be acquired by someone, whether or not it was Panda.

72.    Condon attended the April 2, 2012 Panda senior team meeting and was briefed on the resumed acquisition discussions.

**F.    Defendants' Spring 2012 Trading In Anticipation of An Acquisition Announcement**

73.    On information and belief and as detailed below, the sequence of contacts and trading by Ross, Schultz, and Sagheb in spring 2012 demonstrates that Condon tipped Ross and Schultz material nonpublic information about the potential acquisition of PF Chang's, including the bidding process for PF Chang's and the acquisition offer that PF Chang's had already received from a third-party; that Ross and Schultz both traded on the basis of that information; and that Ross caused Sagheb to trade in parallel with him.

74.    In tipping Ross and Schultz material non-public information about the potential acquisition of PF Chang's, the bidding process for PF Chang's, and the acquisition offer that PF Chang's had already received from a third-party, Condon repeatedly breached the fiduciary duties of trust and confidence he owed to Panda, and disclosed that information for a personal benefit.

75.    In trading on the basis of that material, nonpublic information, Ross and Schultz knew or should have known that Condon had disclosed that information to

them for a personal benefit in breach of the fiduciary duties of trust and confidence he owed to Panda.

### 1. Schultz's spring 2012 trading

76. On April 5, 2012, Panda and PF Chang's signed a confidentiality agreement governing Panda's participation in the bidding process, and PF Chang's provided Panda with due diligence materials for its review.

77. Condon was physically present at Panda's corporate headquarters on April 5, 2012.

78. Soon after leaving Panda's headquarters on April 5, 2012, Condon placed a phone call to Schultz.

79. On April 10, 2012, Panda and PF Chang's executives participated in a conference call in connection with Panda's potential bid for PF Chang's.

80. From April 11-14, 2012, Condon and Schultz traveled to Colorado for a conference with other Landmark Worldwide alumni, where they spent time with each other.

81. The following Monday, on April 16, 2012, Condon was at Panda's corporate headquarters from about 12:30 p.m. PST to 6:00 p.m. PST, and participated in a Panda senior team meeting.

82. During the April 16, 2012 senior team meeting, Panda's CFO provided an update to attendees on the status of Project Potsticker, including that Panda already had, or was about to make, an offer to PF Chang's.

83. On Monday, April 16, 2012, Panda and its financing partner made a formal written offer of $50 per share to PF Chang's.

84. At 6:06 p.m. PST on April 16, only a few minutes after leaving Panda's corporate offices, Condon called Schultz at two different numbers, and spoke with him for 13 minutes.

85. Right after finishing his initial call with Schultz, Condon phoned the executive assistant to one of Panda's co-CEOs, spoke for one minute, and then

immediately called Schultz back at 6:23 p.m. PST.

86.     The next morning, on Tuesday, April 17, 2012, Schultz called his broker at 6:22 a.m. PST and purchased risky, out-of-the-money PF Chang's call options at 6:34 a.m. PST, shortly after the markets opened.

87.     Specifically, Schultz paid $17,000 to buy 200 "July $45" call options – call options with a strike price of $45 and an expiration date of July 21, 2012. Because PF Chang's stock was trading at just below $40 per share at the time, an investor in this series of options was essentially betting $17,000 that Panda's stock price would rise by more than 10% – past the strike price of $45 – within three months' time, even though PF Chang's had not traded above $45 in more than nine months.

88.     That morning, Schultz also bought an even riskier series of PF Chang's call options.  He paid $2,500 for 100 "May $45" call options – call options with a strike price of $45, but an even shorter expiration date of May 19, 2012.  An investor in this series of options was not only betting on the same 10% price increase in PF Chang's, but also that this rise in stock price would occur within just one month's time.

89.     Two weeks later, on April 30, 2012, Schultz made another purchase of the same risky PF Chang's call options, paying $7,500 for 100 "July $45" call options.

## 2.     Ross and Sagheb's spring 2012 trading

90.     On April 19, 2012, Ross returned to the United States from work overseas.

91.     By then, Condon had participated in multiple Panda senior team meetings at which Panda's participation in the spring 2012 bidding process for PF Chang's had been discussed.

92.     One day after Ross's return, on Friday, April 20, Condon called him at 3:52 p.m. PST, and the two spoke for eight minutes.

93.     On Sunday, April 22, Ross called Sagheb at 1:27 p.m. PST, and spoke with Sagheb for a total of 81 minutes.

94.     Because Condon's and Ross' phone call occurred after the close of the market on Friday, April 20, Ross could not trade in the securities of PF Chang's until the following Monday, April 23.

95.     On Monday, April 23, 2012 at 8:26 a.m. PST, Ross purchased the same two series of risky, out-of-the-money PF Chang's call options as Schultz, making the same bets that the stock would rise by more than 10% in a short period of time.  He spent about $3,000 in the aggregate, buying 20 "May $45" call options and 40 "July $45" call options.

96.     That evening, at 5:10 p.m. PST, Ross and Sagheb talked by phone for 36 minutes.

97.     The following morning, on Tuesday, April 24, 2012 at 7:20 a.m. PST, Sagheb purchased a similar series of out-of-the-money PF Chang's call options, spending about $1,500 to purchase 30 call options with a strike price of $45 and an expiration of June 16, 2012.  On the same morning, Ross bought another 40 "July $45" call options for just under $3,700.

98.     Two days after Ross and Sagheb completed their PF Chang's option trades, Ross wrote the following email to Sagheb, with the subject line, "peanut butter & jelly ….":

> *you know, i was just thinking about a bug in the ointment:*
>
> *what if they announce, but the price is lower than we think.*
>
> *what if they say buyout at 45, or 40?*
>
> *i guess that's the risk reward.*
>
> *jon* [sic]

### G.     PF Chang's Announces Acquisition

99.     From April 26 to April 30, Condon continued to exchange phone calls and text messages with Schultz and Ross.

100.   Early in the morning on May 1, 2012, PF Chang's announced that a third-party would be commencing a tender offer for its shares at $51.50 per share.

101.   PF Chang's stock price jumped by approximately 25% on the news.

102.   Schultz sold his PF Chang's call options on May 1, 2012 and realized approximately $231,000 in trading profits.

103.   Ross sold his PF Chang's call options on May 1, 2012 and realized approximately $58,000 in trading profits.

104.   Sagheb sold his PF Chang's call options on May 1, 2012 and realized $17,993.88 in trading profits.

**H.    Condon's and Ross' Efforts To Conceal Their Fraud**

105.   On May 2, 2012, Ross wrote an email to Sagheb with the following instruction:

> *...I don't think we should tell anyone what happened yesterday.*
> *you know what I mean.*

106.   In response, Sagheb wrote, "I told [my good friend and wife] but that's it."

107.   Later that summer, in August 2012, Panda received a FINRA inquiry on trading in the securities of PF Chang's.

108.   FINRA sought information about who at Panda knew of its potential acquisition of PF Chang's, and when those individuals learned that information.

109.   As part of its inquiry, FINRA sent Panda a list of names, called a "name recognition list," and asked Panda to report back on whether those at Panda who had been aware of the potential PF Chang's acquisition knew anyone on the name recognition list.

110.   On September 7, 2012, at 5:40 p.m. PST, Panda's legal counsel sent an email to Condon informing him of FINRA's request for information, and asking Condon to review the name recognition list and identify whether he knew any of the listed individuals.

111.   The name recognition list included the entry, "Schultz, H. and/or T," located in Pasadena, California.

112.   Schultz's wife was named Tana.  At the time of the FINRA inquiry, Schultz and his wife lived in Pasadena, California.

113.   Beginning at 9:15 p.m. PST, Condon and Schultz called one another eight times in the next 90 minutes.

114.   In between calls with Schultz, Condon also telephoned Ross, at 9:25 p.m. PST.  When Ross returned his call at 9:44 p.m. PST, he and Condon spoke for 20 minutes.

115.   The following morning, on September 8, 2012, Condon phoned Ross again and spoke with him for 20 minutes, beginning at 9:02 a.m. PST.

116.   At 10:13 a.m. PST, Condon responded to Panda's email and falsely stated that he did not know anyone on FINRA's name recognition list.

117.   Ten minutes later, at 10:23 a.m. PST – and having just lied to Panda about not knowing a trader identified as "Schultz, H." – Condon called Schultz and spoke with him for three minutes.

118.   At 11:25 a.m. PST, Condon then called Ross, who later returned his call at 12:50 p.m.  Condon and Ross spoke for twelve minutes.

119.   Condon never corrected his false statement to Panda in which he claimed to have no knowledge of any of the individuals listed on the FINRA name recognition list.

### I.   Condon's Breach of His Fiduciary Duties To Panda

120.   Condon owed a fiduciary duty of trust and confidence to Panda.  Under the terms of his consulting agreement with Panda, Condon was obligated to keep Panda's proprietary information, including information about its business, confidential and he was obligated to not misappropriate that information for his own personal benefit.  As a result of this fiduciary relationship, Condon had a duty to abstain from trading on the material non-public information he obtained concerning

the potential acquisition of PF Chang's, or from giving such information to outsiders with the intent to benefit them.

121.   Condon tipped Ross and Schultz material non-public information, on multiple occasions, which Ross and Schultz then used to trade in their own accounts. By tipping Ross and Schultz with material non-public information misappropriated from Panda with the intent to benefit them, Condon breached a duty of trust and confidence he owed to Panda.

## J.   Materiality of the Non-Public Information Condon Provided To Ross and Schultz

122.    In each of the instances described above where Condon misappropriated confidential and non-public information about the potential acquisition of PF Chang's and tipped that information to Ross and Schultz, a reasonable investor would have viewed that information, and each component thereof, as being important to his or her investment decision.  There is a substantial likelihood that the public disclosure of the information misappropriated by Condon and on which Ross and Schultz traded would have been viewed by a reasonable investor as having significantly altered the total mix of information available to investors.  For example, when PF Chang's eventual acquisition was publicly announced in spring 2012, its stock price rose approximately 25%.

## K.   Condon's, Ross' and Schultz's Invocation of their Fifth Amendment Right Against Self-Incrimination

123.   During the SEC's investigation, the SEC staff issued administrative subpoenas to Condon, Ross and Schultz requiring them to testify, under oath, about their trading in PF Chang's securities.

124.   During each of their testimonies, in response to all substantive questions put to them by the SEC staff regarding the facts and circumstances surrounding their trading in PF Chang's securities, Condon, Ross and Schultz all invoked their right against self-incrimination under the Fifth Amendment to the U.S. Constitution and

refused to answer the staff's questions.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection With The Purchase Or Sale Of Securities

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against Defendants Condon and Ross)**

125.    The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

126.    Condon knew, or was reckless in not knowing, that the information he possessed concerning the potential acquisition of PF Chang's was material nonpublic information.

127.    Condon also knew, or was reckless in not knowing, that he owed Panda a duty of trust or confidence to keep the material, nonpublic information he possessed concerning the potential acquisition of PF Chang's confidential.

128.    By disclosing that material, nonpublic information concerning PF Chang's securities to Ross and Schultz, Condon misappropriated confidential information belonging to Panda for securities trading purposes, in breach of a duty of trust or confidence he owed to Panda.

129.    Condon tipped Ross and Schultz with material nonpublic information concerning the potential acquisition of PF Chang's with the intent to benefit his close friends, Ross and Schultz.

130.    Condon knew or recklessly disregarded that Ross and Schultz would trade on the basis of that material nonpublic information and/or tip the information to others who could also be expected to trade on the basis of that information.

131.    Condon, directly or indirectly, personally benefited from disclosing that material, nonpublic information to his close friends.

132.    At the time he traded in the securities of PF Chang's, Ross knew or was reckless in not knowing that he was in possession of material nonpublic information concerning PF Chang's securities.

133. At the time he traded in the securities of PF Chang's, Ross knew or should have known that the material, nonpublic information about PF Chang's that Condon had disclosed to him was disclosed or misappropriated by Condon in breach of a fiduciary duty, or similar relationship of trust and confidence.

134. At the time he traded in the securities of PF Chang's Ross knew or should have known that Condon had tipped him material nonpublic information about PF Chang's with the intent to benefit Ross.

135. By engaging in the conduct described above, Defendants Condon and Ross, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    (a) employed devices, schemes or artifices to defraud;

    (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

136. By engaging in the foregoing conduct, Condon and Ross violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### SECOND CLAIM FOR RELIEF

### Fraud In Connection With a Tender Offer

**Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder**

**(Against Defendants Condon and Ross)**

137.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

138.   By the time of Defendants' trading in PF Chang's securities in the fall of 2011, substantial steps had been taken by Panda to complete a tender offer to acquire PF Chang's securities.  Specifically, in the fall of 2011, Panda began acquiring PF Chang's common stock in anticipation of acquiring the company, and owned just under five percent of PF Chang's securities by March 2012.

139.   In addition, by the time of Defendants' trading in PF Chang's securities in the spring of 2012, additional substantial steps had been taken by Panda to complete a tender offer to acquire PF Chang's securities.  Specifically, on April 5, 2012, Panda and PF Chang's signed a confidentiality agreement, and thereafter conducted continued due diligence; and on April 16, 2012, Panda made a non-binding offer to PF Chang's of $50 per share.  All of these actions constituted substantial steps by Panda to complete a tender offer.

140.   Condon was in possession of material information relating to such tender offer which information he knew or had reason to know was nonpublic and which he knew or had reason to know he had acquired, directly or indirectly, from the offering person, and/or its officers, directors, partners, employees, or other persons acting on behalf of the offering person.  Condon was required to refrain from communicating that information to third-parties, including Ross and Schultz, under circumstances in which it was reasonably foreseeable that such communications were likely to result in the trading of PF Chang's securities.

141.   By communicating that material nonpublic information concerning such tender offer to Ross and Schultz, for the purpose of benefiting them and with the

expectation that Ross and Schultz would trade in PF Chang's securities on the basis of that information, Condon caused Ross and Schultz to purchase and sell PF Chang's securities.

142.   At the time he traded in  PF Chang's securities, as alleged herein, Ross was in possession of material information regarding such tender offer that he knew or had reason to know was nonpublic and had been acquired, directly or indirectly, by Condon, acting on behalf of Panda, from the offering person.

143.   By engaging in the foregoing conduct, Condon and Ross violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and Rule 14e-3 thereunder, 17 C.F.R. § 240.14e-3.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

### (Against Relief Defendant Sagheb)

144.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

145.   Sagheb received ill-gotten gains from trades based on material nonpublic information, over which he has no legitimate claim.

146.   Sagheb obtained the ill-gotten gains described above as part of the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for him to retain the funds.

147.   By engaging in the foregoing conduct, Sagheb has been unjustly enriched and must disgorge his ill-gotten gains.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Condon and Ross committed the alleged violations.

## II.

Issue judgements, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants Condon and Ross and their agents, servants, employees, attorneys and those persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, from violating Sections 10(b) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), and Rules 10b-5 and 14e-3 thereunder, 17 C.F.R. §§ 240.10b-5, 240.14e-3.

## III.

Order Condon to jointly and severally disgorge the illegal trading profits described herein, plus prejudgment interest.

## IV.

Order Ross to disgorge his illegal trading profits described herein, plus prejudgment interest.

## V.

Order Condon and Ross to pay civil penalties under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

## VI.

Order Sagheb to disgorge all trading profits and other ill-gotten gains to which he does not have a legitimate claim that he received as a result of the conduct alleged in this Complaint, plus prejudgment interest.

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 23, 2015

/s/ Gary Y. Leung

GARY Y. LEUNG
DONALD W. SEARLES
SARA D. KALIN
Attorneys for Plaintiff
Securities and Exchange Commission